HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| Alaska National Insurance Company,<br><br>                  Plaintiff,<br>    v.<br><br>Metro Metals Northwest, Inc., Pacific Coast Shredding, LLC, and Port of Vancouver, USA,<br><br>                  Defendant. | CASE NO. 1:17-cv-05765-RBL<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

**INTRODUCTION**

THIS MATTER is before the Court on Plaintiff Alaska National Insurance Company's Motion for Summary Judgment regarding its duty to defend and indemnify Metro Metal Northwest, Inc. and Pacific Coast Shredding, LLC, in a separate lawsuit. Dkt. #33. Metro/PCS entered into an agreement with the Port of Vancouver to use a dock for loading scrap metal onto ships. The dock was damaged, and the Port demanded reimbursement for repairs, consistent with their agreement. Metro/PCS refused, the Port sued, and Metro/PCS tendered defense to their

insurers.[1] Alaska asks the Court to issue a declaratory judgment that it has no duty to defend or indemnify Metro/PCS.

Alaska argues that the underlying allegations do not constitute an "occurrence," which is defined in the policy as an "accident." The Port and Metro/PCS had an agreement regarding the latter's use of the Terminal 2 dock, including a provision that Metro/PCS was responsible for repairing any damage. Consequently, Alaska contends that the damage alleged in the underlying complaint was anticipated and thus could not be accidental. Alaska also asserts that coverage is excluded because the alleged damage arose from Metro/PCS's "operations," and occurred on property that Metro/PCS "own[ed], lease[d], or occup[ied]."

Metro/PCS assert a number of arguments in opposition. Most importantly, Metro/PCS argue that the underlying complaint contains a negligence claim and can be liberally read to allege facts constituting accidental damage. In addition, Metro/PCS contend that the ongoing operations exclusion is narrower than Alaska presents, and that mere permission to use the Terminal 2 dock involves insufficient control to constitute "occupy[ing]" the dock.

**BACKGROUND**

The following facts are derived from the Port of Vancouver's underlying complaint against Metro/PCS, as well as the attached agreement and demand letter. *See* Dkt. #34, Ex. 7. In 2009, the Port entered into an agreement with Metro regarding use of the Port's Terminal 2 dock for scrap metal loading. *Id*. at 10. This additional "staging space" for Metro's operations was provided in consideration of Metro's obligation to increase the amount of metal it exported

---

[1] In a separate action, Metro/PCS's insurer for a different time period has sued Metro/PCS for a declaratory judgment regarding its duty to defend in the same underlying lawsuit against the Port. *See Unigard Ins. Co. v. Metro Metals Northwest, Inc.*, No. 17-cv-05743-RBL (W.D. Wash. 2017). The policies at issue in that case have identical definitions and exclusions as the policies here, and the parties' arguments and briefs on summary judgment are substantially the same. Consequently, the Court has issued a nearly identical order granting summary judgment in that case.

through the Port. *Id*. The agreement also outlined other responsibilities of the parties, including Metro's responsibility to "[r]epair damage to the terminal areas used for scrap steel operations." *Id*. at 11.

Metro and its subsidiary, PCS, began using Terminal 2 for their operations, but in 2011 the Longshore and Warehouse Union expressed concerns about the structural integrity of the dock. *Id*. at 2. The Port performed short-term repairs, and subsequently contracted with a consultant to evaluate the extent of the damage. *Id*. at 2-3. The consultant reported that the damage to the dock included "degradation of the concrete surface, exposed reinforcing steel rebar, and missing reinforcing steel rebar." *Id*. at 3.

In October of 2011, The Port received a proposal for repairs and contacted Metro to discuss the plans. *Id*. However, Metro/PCS was unresponsive and continued their operations at the dock, causing additional damage. *Id*. The Port eventually accepted a bid for permanent repairs to the dock, which took place between September and December of 2012. *Id*. at 4. During and after the repairs, Metro/PCS continued to load scrap metal at the dock. *Id*.

In October of 2016, the Port sent a letter to Metro/PCS demanding reimbursement for the cost of repairs, which totaled $1,558,141.68. *Id*. Metro/PCS did not respond, and the Port sued Metro/PCS in June of 2017. The amended complaint alleged breach of contract, unjust enrichment, and an alternative cause of action for negligence against PCS in the event that PCS was found not to be an agent, assignee, or alter ego of Metro. *Id*. at 4-6. Metro/PCS tendered defense and indemnity to Alaska, which agreed to defend under a reservation of rights. Dkt. #1, at 2. Alaska then brought this declaratory judgment action to determine coverage. *Id*. at 3.

Alaska issued primary general liability and commercial umbrella coverage policies to Metro/PCS in 2006. *Id*. at 2. The policies were effective from August 22, 2006 through August

22, 2010. *Id*. Both policies provide coverage and a duty to defend suits alleging "property damage" caused by an "occurrence," and contain exclusions for damage to property the insured owns, rents, or occupies; damage arising out of the insured's operations; and expected or intended damage. Dkt. #33, at 7-9.

## DISCUSSION

**A.     Legal Standards**

*1.     Summary Judgment*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986) (emphasis added); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

## 2. Declaratory Judgment regarding the Duty to Defend

"Interpretation of an insurance contract is a question of law." *Woo v. Fireman's Fund Ins. Co.*, 161 Wash. 2d 43, 52 (2007). Terms are to be interpreted as the "average person purchasing insurance" would understand them. *Id*. While the insured has the burden of proving that claims fall within a grant of coverage, the insurer has the burden of proving that an exclusion bars coverage. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731 (1992). The duty to defend is broader than the duty to indemnify, and arises at the time the action is filed based on the potential for liability. *Woo*, 161 Wash. 2d at 52. "If the insurer is unsure of its obligation to defend in a given instance, it may defend under a reservation of rights while seeking a declaratory judgment that it has no duty to defend." *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wash. 2d 751, 761 (2002).

In Washington, in a declaratory judgment action, the duty to defend is determined by the facts alleged in the complaint.[2] *Indian Harbor Ins. Co. v. Transform LLC*, 2010 WL 3584412, at *3 (W.D. Wash. Sept. 8, 2010) (citing *Holland Am. Ins. Co. v. Nat'l Indem. Co.*, 75 Wash. 2d 909, 911 (1969)). "[I]f a complaint is ambiguous, a court will construe it liberally in favor of triggering the insurer's duty to defend." *Woo*, 161 Wash. 2d at 53. Although an insurer may look outside the complaint if the allegations are contradictory or ambiguous, or if coverage is unclear, the insurer may only rely on extrinsic facts to *trigger* the duty to defend. *Grange Ins. Ass'n v. Roberts*, 179 Wash. App. 739, 752 (2013) (quoting *Woo v. Fireman's Fund Ins. Co.*, 161 Wash.

---

[2] In its complaint, Alaska states that Oregon law may apply as foreign law. Dkt. #1, at 4. However, the underlying events of this case took place in Washington, the Port is in Washington, and PCS is a Washington entity. Only Metro appears to be an Oregon entity. "If applying the two states' laws would produce the same result, there is a 'false conflict' and Washington law will presumptively apply." *Alaska Nat. Ins. Co. v. Bryan*, 125 Wash. App. 24, 30, 104 P.3d 1, 5 (2004). To the extent that Metro/PCS argue about choice of law, they mainly focus on small differences between Washington and Oregon regarding extrinsic evidence in a declaratory judgment. Because both states essentially bar courts from considering extrinsic evidence to relieve an insurer of its duty to defend, the result is the same and no conflict of law analysis is necessary.

2d 43, 52-54 (2007)). "After obtaining a declaration of noncoverage, an insurer will not be obligated to pay from that point forward." *Nat'l Sur. Corp. v. Immunex Corp.*, 176 Wash. 2d 872, 885 (2013) (internal quotations omitted).

Alaska stated in its complaint that Oregon law may apply, and Metro/PCS argue that Oregon law is not identical to Washington with respect to considering extrinsic evidence to determine the duty to defend. However, in Oregon, the duty to defend is likewise largely determined by looking to the allegations in the complaint. In *North Pacific Insurance Co. v. Wilson's Distributing Service, Inc.*, the Oregon Court of Appeals addressed "whether an insurer may avoid its duty to defend by developing evidence in a declaratory judgment proceeding, commenced before the underlying action is concluded, to show that its policy does not cover the claim being asserted in the underlying tort action." 138 Or. App. 166, 170 (1995). The court held that it may not rely on such evidence unless it has been uncontrovertibly established in a separate proceeding. *Id*. at 174.

**B.     The Underlying Complaint's Allegation of an "Occurrence"**

The policies state that Alaska "will have the right and duty to defend the insured against any 'suit' seeking . . . damages because of . . . 'property damage' . . . ." Dkt. #33, at 7. The policies also require that "property damage" be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 7-8. Alaska argues that the damage alleged in the underlying complaint does not qualify as an "occurrence" because it was anticipated in the agreement between Metro/PCS and the Port. *See* Dkt. #34, Ex. 7, at 11 (stating that Metro has a responsibility to "[r]epair damage to the terminal areas used for scrap steel operations").

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT - 6

1    In opposition, Metro/PCS argue that the claim of negligence against PCS in the
2  underlying complaint means that the damage to the dock constitutes an "occurrence." *See id.*, at
3  6. According to Metro/PCS, "a liberal interpretation of the complaint is that the property damage
4  occurred from repeated or irresponsible dumping of HMS and scrap," which would constitute
5  "repeated exposure to substantially the same general harmful conditions," which would fall
6  within the policies' "occurrence" definition. Dkt. #39, at 16; Dkt. #33, at 8.

7    The Court agrees that the repair provision in the agreement between Metro/PCS and the
8  Port indicates that both sides anticipated damage to the dock as a result of the scrap metal
9  loading operations. This suggests that the damage was not an unexpected "accident" from the
10 perspective of Metro/PCS. However, the Court also recognizes that the repair provision in the
11 agreement is very broad, and would seemingly require Metro/PCS to repair any damage at all to
12 the terminal areas it was using, regardless of how unforeseeable the cause. It is therefore a close
13 question whether the damage alleged in the underlying complaint constitutes an "occurrence."
14 Because the Court holds that Alaska has no duty to defend under the ongoing operations
15 exclusion, the Court will not decide the "occurrence" issue.

16 **C.    The "Ongoing Operations" Exclusion**

17    Alaska's next argument focuses on exclusions j.(5) and m.(1). This policy language
18 excludes coverage for "property damage" to "that particular part of real property on which you
19 or any contractors or subcontractors working directly or indirectly on your behalf are performing
20 operations, if the 'property damage' arises out of those operations." Dkt. #33, at 14. Alaska
21 argues that the complaint specifically alleges that Metro/PCS's operations caused the damage to
22 the dock. Dkt #34, Ex. 7, at 3. Consequently, the exclusion applies and Alaska has no duty to
23 defend.

24

1       Metro/PCS respond with several arguments. First, they point out that Alaska did not

2 allege in its complaint that exclusion j.(5) applies, and thus cannot rely on it now at summary

3 judgment. Second, Metro/PCS argue that the exclusion only applies to workmanship defects on

4 construction projects, which does not describe Metro/PCS's operations at the dock. *See*

5 *MidMountain Contractors Inc. v. Am. Safety Indem. Co.*, 893 F. Supp. 2d 1096 (W.D. Wash.

6 2012), *order stricken in part* No. C10-1239JLR, 2013 WL 5492952 (2013). Third, Metro/PCS

7 contend that a dock or wharf does not qualify as "real property," which is not defined in the

8 exclusion. Finally, Metro/PCS contend that the exclusion only applies to the insured's "entire

9 operations," but only a portion of Metro/PCS's operations were at the dock. *See Canal Indem.*

10 *Co. v. Adair Homes, Inc.*, 737 F. Supp. 2d 1294, 1301 (W.D. Wash. 2010).

11       The Court will address the procedural objection first. In *Healy Tibbitts Construction Co.*

12 *v. Insurance Co. of North America*, the Ninth Circuit allowed the insurer to raise an unpled

13 policy exclusion as an affirmative defense on summary judgment where no prejudice resulted.

14 679 F.2d 803, 804 (9th Cir. 1982); *see also Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d

15 708, 713 (9th Cir. 2001). Here, Metro/PCS has not claimed any prejudice and has indeed

16 formulated a full argument in defense. Furthermore, Alaska referenced all policy exclusions as

17 affirmative defenses in its answer to Metro/PCS's counterclaims, and specifically referenced the

18 exclusion in its reservation of rights letter. Dkt. #16, at 3; Dkt. #19, Ex. 1, at 7-8; *see Coleman v.*

19 *Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (holding that a plaintiff may assert a legal

20 theory at summary judgment if it was previously raised in pleadings or during discovery).

21 Therefore, although Alaska is not using exclusion j.(5) as an affirmative defense, Alaska has

22 raised the exclusion and Metro/PCS will not be prejudiced if it is addressed on summary

23 judgment.

24

Multiple Washington cases have held that the ongoing operations exclusion applies broadly. In *Vandivort Construction Co. v. Seattle Tennis Club*, the insured contractor's operations caused an earthslide that damaged the site. 11 Wash. App. 303 (1974). The contractor tendered the matter to its insurer, which denied coverage, and the contractor paid the additional costs itself. *Id*. at 303-04. In holding that the insurer correctly denied coverage, the court relied on policy language excluding "damage to 'that particular part of any property, . . . upon which operations are being performed by . . . insured . . . arising out of such operations.'" *Id*. at 308. Although the insured argued that the exclusion could not apply to damage that was claimed outside the tennis club's property line, the court held that the plain language of the exclusion covered all damage caused by the insured's operations. *Id*.; *see also Ohio Cas. Ins. Co. v. Ferrell Developments, LLC*, 2011 WL 5358620 (D. Or. July 27, 2011) (also applying the exclusion to bar coverage for any damage arising out of the contractor's work on the property).

*Canal Indemnity Co. v. Adair Homes, Inc.* similarly applied an ongoing operations exclusion to bar coverage for construction work that caused a mold problem. *Canal Indem. Co. v. Adair Homes, Inc.*, 737 F. Supp. 2d 1294, 1297 (W.D. Wash. 2010), *aff'd*, 445 F. App'x 938 (9th Cir. 2011). The relevant exclusion barred coverage for "property damage to [t]hat particular part of real property which you or any contractors or subcontractors . . . are performing operations if the property damage arise [sic] out of those operations . . ." *Id*. at 1301. The court noted that this type of policy language is "not limited to [the] portion of property that was subject to operations." *Id*. The court then held that the plain language of the exclusion barred coverage for property damage occurring during the construction. *Id*. at 1302. The court also explained that CGL policies are designed to cover such risks as "employee injuries while on the work site and physical damage to property other than the work of the insured," but are not intended to protect

the insured from "common business risk[s]" or function as a performance bond. *Id*. (internal quotations omitted).

Here, the underlying complaint repeatedly alleges that Metro/PCS's operations caused the damage to the dock. It describes the damage as "degradation of the concrete surface, exposed reinforcing steel rebar, and missing reinforcing steel rebar," and states that Metro/PCS "was the only entity using the dock, and therefore, their operations were responsible for the damage." Dkt. #34, Ex. 7, at 3. The demand letter from the Port, which was attached to the underlying complaint, also describes how Metro/PCS's tore apart the dock's concrete and caused the reinforcing steel to become exposed or missing by moving scrap metal around. *Id*. at 16. Metro/PCS itself characterizes the complained-of conduct as "negligence by dumping HMS and scrap while conducting loading activities onto berthed ships at the Terminal 2 dock." Dkt. #39, at 22. Whether Metro/PCS's operations were performed responsibly is not the issue. Under even a liberal interpretation of these allegations, the damage to the Terminal 2 dock arose from Metro/PCS's scrap metal operations performed on "that particular part of real property."[3] Therefore, coverage is excluded and Alaska has no duty to defend.

Metro/PCS argue that the exclusion does not apply in this situation because the damage caused by Metro/PCS does not amount to a "workmanship defect."[4] Although they do not say so, Metro/PCS essentially read the phrase "real property on which you . . . are performing

---

[3] Metro/PCS make an extended argument that the Court may not consider extrinsic evidence when determining the duty to defend, and therefore cannot look at the full KPFF report that is referenced in the underling complaint but not attached to it. *See* Dkt. #34, Ex. 7, at 3. The Court need not address this because the underlying complaint and the documents that are attached, including the agreement between the Port and Metro/PCS and the Port's subsequent demand letter, are sufficient to resolve the issue here.

[4] Metro/PCS may have obtained this reference to "workmanship defects" from *Canal*, where the court stated, "This exclusionary language is designed to exclude coverage for defective workmanship by the insured builder causing damage to the construction project." 737 F. Supp. 2d at 1302. However, the court was referring to a different part of the exclusion barring coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because [the insured's] work was incorrectly performed on it." *Id*. That language is not at issue here.

operations" to require some sort of improvements to the claimant's real property for the exclusion to apply. However, it is irrelevant that the operations at issue were not a construction project intended to improve the dock because "[t]he plain meaning of the language covers the situation here." *Vandivort*, 11 Wash. App. at 308. The type of damage suffered by the Port falls squarely within the realm of "common business risk[s]" that this language is intended to exclude, regardless of whether the business is construction or loading scrap metal. *See Canal*, 737 F. Supp. 2d at 1302. Indeed, numerous courts have applied the ongoing operations exclusion in contexts other than construction. *See, e.g., Burlington Ins. Co. v. Steve's AG Servs., Ltd.*, 259 F. App'x 45, 47 (9th Cir. 2007) (logging); *Arroyo v. Alaska Ins. Co.*, 669 F. App'x 881 (9th Cir. 2016) (development and management of a vineyard); *Houston Bldg. Serv., Inc. v. Am. Gen. Fire & Cas. Co.*, 799 S.W.2d 308, 311 (Tex. App. 1990) (janitorial services).

In addition, Metro/PCS's narrow reading contradicts the holding in *Vandivort*. In that case, the Washington Court of Appeals applied the ongoing operations exclusion to damaged parts of the site that the insured was not working on, as well as entirely separate property owned by the city. *Vandivort*, 11 Wash. App. at 304, 308*; see also William Crawford, Inc. v. Travelers Ins. Co.*, 838 F. Supp. 157, 158 (S.D.N.Y. 1993) (applying the exclusion where the insured only worked on one apartment but caused damage to other parts of the building). Thus, although the insured in *Vandivort* was improving the claimant's real property, the application of the exclusion had nothing to do with that. The insured could have just as easily caused the earthslide because of scrap metal loading operations.

Even if the Court were to adopt a narrower reading of the exclusion, the agreement between the Port and Metro/PCS encompasses the latter's improvements to the dock. The agreement states that Metro/PCS will "repair damage to the terminal areas used for scrap metal

operations." Dkt. #34, Ex. 7, at 11. This is, in essence, a contract to export certain quantities of metal from the Terminal 2 dock while maintaining it in good condition.[5] Metro/PCS's failure to accomplish this amounts to a "workmanship defect." Finding a duty to defend in this situation would thus change the CGL policy into exactly the kind of "performance bond" described in *Canal*. *See* 737 F. Supp. 2d at 1302.

The Court also rejects Metro/PCS's argument that the dock is not "real property" and therefore cannot be subject to the exclusion. Permanent improvements upon tidelands are considered real property in Washington. In *Pier 67, Inc. v. King County*, the court assessed the tax status of a motel built on a pier leased from the state. 71 Wash. 2d 92, 93, 426 P.2d 610, 611 (1967). The court described the building as "permanently erected on real property," and agreed with the trial court that "[t]he improvements became, as erected, a part of the realty." *Id*. at 94. In other words, the court found that the pier was real property, which means that the dock at issue here is also real property. *See also Garrisey v. Westshore Marina Assocs.*, 2 Wash. App. 718, 726 (1970) ("[A] dock or pier . . . is considered an extension of the land."); *Curry v. Skipanon Investments Oregon Ltd.*, 83 Or. App. 694, 695 (1987) ("We agree with the trial court that the docks are part of the real property.").

Metro/PCS's argument that the exclusion does not apply because the agreement with the Port did not concern Metro/PCS's "entire operations" likewise misses the mark. *Canal* did state that the ongoing operations exclusion applies "to the insureds' entire operations," but the subsequent citation to *Vandivort* makes clear that the court merely meant that the exclusion is "not limited to [the] portion of the property that was subject to operations." 737 F. Supp. 2d at

---

[5] Metro/PCS claim that they did not "engage in operations for the Port in any respect," but this is inaccurate even aside from the repair provision. The main purpose of the agreement between Metro/PCS and the Port was to provide Metro/PCS with more space so it could ship more metal through the Port. Dkt. #34, Ex. 7, at 10. Metro/PCS's scrap metal operations were thus "for" the Port in the sense that they directly benefitted it.

1301. The court did not mean that an insured's "entire operations" must be at the site of the damage, as Metro/PCS suggest. Just because Metro/PCS may perform other aspects of its operations at other sites does not mean that it was not also performing operations at the Terminal 2 dock. Consequently, exclusions j.(5) and m.(1) apply to relieve Alaska of its duty to defend.

D.     **Other Exclusions**

The Court does not reach the issue of whether exclusion a., which bars coverage for "expected or intended" damage, or exclusions j.(1) and m.(1), which bar coverage for damage to property owned, rented, or occupied by the insured, apply in this case.

## CONCLUSION

For the reasons stated above, Alaska's Motion for Summary Judgment (Dkt. #33) is **GRANTED**.

IT IS SO ORDERED.

Dated this 11th day of October, 2018.

Ronald B. Leighton
United States District Judge